No. 29,146.

FRED L. ROBERTS, *Appellant,* v. VELMA ROBERTS, as an Individual and as the Executrix of the Last Will and Testament of C. M. Roberts, Deceased, *Appellee.*

(285 Pac. 584.)

Opinion filed March 8, 1930.

*S. S. Alexander,* of Kingman, for the appellant; *E. C. Minner,* of Dodge City, of counsel.

*J. N. Tincher, Don Shaffer, J. N. Farley* and *F. Dumont Smith,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

JOCHEMS, J.: This action was brought by plaintiff seeking to have title to a half section of land decreed to be vested in him by reason of an implied trust existing by operation of law, or to obtain specific performance of an oral contract relating to said lands.

Plaintiff alleged, in substance, that he was the son of C. M.

Roberts, deceased; that the defendant was the second wife of C. M. Roberts and was the sole legatee and devisee under his last will and testament; that on August 19, 1895, the plaintiff reached the age of twenty-one years and that his father requested that he remain at home with him; that about that time there was a quarter section of land near by, known as the Thurston quarter, which was under foreclosure on a mortgage in the amount of $535; that the father, C. M. Roberts, told the plaintiff that the fee title could be obtained for $50 and that it was agreed, in substance, between the father and the plaintiff that the father should loan plaintiff the $50 with which to buy said land subject to the mortgage; that if the plaintiff would remain at home and work with him for several years after he reached lawful age, that he should then have the title to this quarter of land; that in the meantime he should farm the land, which was understood to belong to plaintiff, and thereby would be enabled to procure the funds to repay the father the $50 advanced by him and the amount of the encumbrance against the land and clear up the title thereto; that plaintiff did, under such agreement, farm the land for five or six years, during all of which time the father received all of the proceeds from the crops thereon, and the proceeds so obtained by the father were more than sufficient to repay him the amount of the money advanced by him in paying for said land, and the encumbrance thereon; that later the plaintiff learned that title had been taken in his father's name and upon calling this to his father's attention was told that it would be all right; that it made no difference; that the land belonged to plaintiff and he (the father) would see that plaintiff eventually got said land the same as if the legal title had been taken in the name of plaintiff; that for a period of five or six years after making such agreement, and the purchase of said land, the plaintiff continued to remain at home and render all such services as were directed by the father, receiving no compensation whatsoever therefor; that about 1901 the plaintiff married and moved away from his father and established a home of his own and began farming for himself; that about 1906 there were two quarter sections of land in section 18, township 28, south, range 23, west, in Ford county, for sale; that these lands lay near some land owned by the father; that the father advised plaintiff that it would be more advantageous to sell the Thurston quarter and invest the proceeds

in this land in section 18; that plaintiff, relying upon the advice and counsel of his father, agreed that the Thurston land might be sold and the proceeds invested in the land in section 18; that in the summer of 1906 the Thurston land was sold for $4,000 and the land in section 18 purchased for $2,800 and the father retained the remainder of the proceeds from the Thurston land; that again, without the knowledge of plaintiff, the father took title to the land in section 18 in his own name, and later when plaintiff learned of this the father again said that it made no difference; that the land belonged to plaintiff the same as if it stood in his name and that under their old agreement the plaintiff would eventually receive and secure said land, but that the plaintiff's father desired to use the land in connection with his stock and farming operations, and plaintiff, relying upon his father, permitted this arrangement to continue.

Plaintiff further alleged that at or about the time he learned that the land in section 18 had been taken in the name of his father, it was further agreed between them that such land in section 18 would belong to the plaintiff and that the plaintiff would eventually secure the same after the father had finished using the same; that in any event, in consideration of such services performed by the plaintiff in favor of his father, it was agreed between them that the plaintiff should have such land at the time of or prior to the death of his father, and that before or at such time the father would convey to the plaintiff the land in section 18. The plaintiff alleged that he had demanded possession of the land from the defendant, which had been refused, and prayed the court to adjudge and decree that plaintiff is the owner of the real estate described in section 18; that his title thereto be quieted against the defendant; that he be found entitled to the possession thereof; that the defendant be ordered to convey to him the proper record legal title thereto and that defendant be ejected from said real estate.

The defendant answered by general denial, pleaded the statute of limitations and set up adverse possession on the part of the deceased C. M. Roberts and herself running for a period of more than twenty years. She further alleged that at the time she married C. M. Roberts he promised to devise to her all lands which he owned in his last will and testament. She pleaded a property

settlement between C. M. Roberts and his former wife, Maggie L. Roberts, and set up in her answer that the written agreement under which the lands in controversy in section 18 were reserved by C. M. Roberts was witnessed by the plaintiff; that the plaintiff assisted his mother, Maggie L. Roberts, in the making of the contract; that at no time, either before or after her marriage, did the plaintiff ever claim to defendant to have any interest in said real estate until about the time he filed the action; that C. M. Roberts had willed her his property in accordance with his promise made at the time she married him.

The action was tried by the court and a jury was called to act in an advisory capacity. The jury made findings of fact which were adopted and approved by the court. The findings material to the decision of the case are as follows:

"1. Do you find that C. M. Roberts bought the southwest quarter of section nine (9), township twenty-eight (28), range twenty-two. (22), with his own money and took the title in his own name, and made a verbal agreement with plaintiff that if he remained at home several years after he became of age and worked for his father, and as he directed, that he should have that quarter of land as his compensation for such services? A. Yes.

"4. Did the plaintiff and C. M. Roberts make a verbal contract about July, 1906, changing the terms of the original contract, by which it was agreed that C. M. Roberts should sell the said quarter of land for $4,000, and that in exchange for that quarter plaintiff should have the northeast quarter of section 18, township 28, range 23, which C. M. Roberts had bought with his own money and had taken the title in his own name on January 19, 1906, and that C. M. Roberts would buy the northwest quarter of section 18, and that the plaintiff should have that half section instead of the southwest quarter of section 9? A. No.

"6. At the time of making the first verbal agreement in 1895, or at the time of making the second verbal agreement in 1906, if you find said agreements were actually made, was it agreed therein that plaintiff was to have possession of said land when he performed the agreement? A. No.

"7. Was it orally agreed that C. M. Roberts should have the possession and use of such land until his death or until he was through with it? A. Yes.

"8. Do you find that there was any other verbal agreement between C. M. Roberts and the plaintiff which changed in any manner the terms and conditions of the first and second verbal agreements? A. No.

"12. Were the friendly relations which existed between the plaintiff and his father at the time they entered into the first and second agreements changed before his father's death? A. Yes.

"13. If you answer question No. 12 in the affirmative, how long had those changed feelings existed before the father's death? A. At division of property.

"14. Did plaintiff, Fred L. Roberts, and his father, C. M. Roberts, orally agree near the time plaintiff became of age that if the said Fred L. Roberts

would continue to remain at home and work with and assist his father for a few years that his father would advance the funds to purchase for plaintiff the southwest quarter of section 9, township 28, range 22, in Ford county, Kansas? A. Yes."

An additional question was submitted by the court at the request of the plaintiff, as follows:

"Did the plaintiff, Fred L. Roberts, and his father, C. M. Roberts, orally agree about July, 1906, or March, 1907, that the land in section 18 in controversy should go to Fred L. Roberts on the death of his father? A. Yes."

Numerous other findings were made by the jury, and in addition thereto the court on its own motion made additional findings, but we believe the foregoing are all that are material to a determination of this case.

The court found as a matter of law: (a) That the alleged verbal agreements between the plaintiff and his father, C. M. Roberts, were within the statute of frauds and void. (b) That there was no express trust. (c) That no trust arose by implication of law.

The plaintiff contends that he is entitled to recover on two theories: (1) That under the evidence and the findings a trust resulted by implication of law in his favor; (2) that he is entitled to recover the real estate by reason of the agreement found by the additional question submitted by the court that the lands in section 18 should go to plaintiff on the death of his father.

It should be noted that following the agreement set forth in finding No. 1, the other findings show, in substance, that about six years later the plaintiff married and the year following, which would be about seven years after making the agreement, he quit working for his father and went to farming for himself; that when he began farming for himself he went to live upon a quarter of school land and left his father in full possession of the Thurston quarter without any change of title; that the father always had possession of the land in section 18 from the time he first purchased it, and that there was no agreement that plaintiff should have possession of the said land when he had performed his agreement; that it was orally agreed that the father should have possession and use of the land until his death and "until he was through with it." That some time in the spring of 1927 the plaintiff knew that his father would not make a will or deed giving him the land in section 18; that the friendly relations between the plaintiff and his father were changed by reason of the divorce proceedings between his father and mother

and the division of the property which occurred at that time. It appears that the plaintiff began farming on his own account and moved away from home in 1902 and that he did not make any attempt to claim the land in controversy until the spring of 1927, when he tried to get Mr. Van Riper, an attorney, to have his father deed him the land in section 18, and also attempted to have Mr. Dugan, a banker, obtain the same result. Both testified that they did make an effort to get the father to deed the land over to the plaintiff, but that he refused, stating that "Fred had had enough." It further appears from the record that soon after the Thurston quarter was purchased, the plaintiff learned that title had been taken in his father's name, and again soon after the purchase of the land in section 18, he learned that title in that land had been so taken.

Finding No. 1, above set out, does not fit the requirements of the statute. (R. S. 67-408.) In other words, the situation contemplated in the statute is one in which A advances or furnishes the purchase price to B and B uses the purchase price in payment of the land and takes the title in his name; or where it is made to appear "that by agreement and without any fraudulent intent the party to whom the conveyance was made or in whom the title shall vest was to hold the land or some interest therein in trust for the party paying the purchase money or some part thereof."

Under the facts in the case herein the purchase money for this land was all advanced by the father, and giving the finding its most liberal construction it simply states an arrangement whereby the father took the title to the land purchased by his own money and then agreed that if the son would remain at home several years after he became of age and work for the father as he directed, that he (the father) would then convey to him the quarter of land as compensation for such services. In other words, it sets forth an oral agreement with reference to the acquisition of a tract of real estate. Nothing more; nothing less. It is clearly void because it is within the statute of frauds. (R. S. 33-106.) Neither can it be enforced as an express trust because of the provisions of R. S. 67-401.

In *Engelbrecht v. Herrington*, 103 Kan. 21, 172 Pac. 715, it was held:

"A parol contract for the sale of lands or of any interest therein is within the statute of frauds and unenforceable unless it is taken out of the statute by some fact or circumstance connected with it." (Syl. ¶ 3.)

In the opinion the court said:

"Plaintiff contends that performance of the contract on his part was sufficient to take it out of the statute. Performance by him is the equivalent of payment of the purchase price of one-half the farm, but, under the authorities, that will not take a parol contract concerning lands out of the statute." (p. 23.)

Further, the court said:

"The general rule is that every parol contract concerning lands is within the statute of frauds and perjuries and unenforceable except where the performance cannot be compensated in damages. The fact that the consideration for the contract was to be paid in services, and not in money, makes no difference in the application of the rule. If the value of the plaintiff's services may be determined and compensation made in money the case is not taken out of the statute. (*Baldwin v. Squier,* 31 Kan. 283, 1 Pac. 591.)" (p. 24.)

But the plaintiff further contends that even though the original contract set forth in finding No. 1 was void as being within the statute of frauds, nevertheless he is still entitled to recover because of the agreement set forth in the finding of the jury in answer to the additional question submitted by the court, which finding was that the land in section 18 "should go to Fred L. Roberts on the death of his father."

The trouble with this contention is that this finding, which shows that the oral agreement to that effect was made about July, 1906, or March, 1907, amounted substantially to an agreement on the part of the father to devise real estate to the son. It was not in writing and was therefore void.

The appellant cites the case of *Stahl v. Stevenson,* 102 Kan. 844, 171 Pac. 1164, at which place the opinion on rehearing is set forth. The original decision was reported at page 447 in the same volume. In that case the oral agreement relied upon was that the grandfather of the plaintiff had promised that she should have a one-third interest in his estate in consideration of her signing a release on an insurance policy. It should be noted that the agreement was to leave her a one-third interest in his estate of whatever it might happen to consist. This would not necessarily be real estate. In the opinion on rehearing the court in discussing this question further said (near the bottom of page 845):

"A promise to devise a specific tract of land is within the statute."

The Stahl case was tried and decided upon the theory that the contract involved did not necessarily concern real estate; that at the time it was made, it was possible that it might be fully carried out without the passing of title to any lands whatever and the judgment was that that view is in accordance with reason and not out

of harmony with the effect generally given to the statute of frauds, although exceptions and decisions to the contrary may be found.

Under the additional question submitted by the court the jury found that in July, 1906, or March, 1907, the plaintiff and his father orally agreed that the land in section 18 should go to Fred L. Roberts on the death of his father. This is an agreement to devise specific lands. It is within the statute of frauds (R. S. 33-106) and is void. (See *Baldwin v. Squier*, supra; *Nelson v. Schoonover*, 89 Kan. 388, 131 Pac. 147.)

The appellant further argues that his contract so found should be upheld because of the services he rendered. Again it must be noted that the finding above set forth does not present a case wherein an agreement is made between two persons (A and B) such that A agrees to leave his real estate to B at his death in consideration of B rendering services to A by looking after his property, taking care of his physical needs and rendering services such as looking after him in his old age, nursing, providing medical care, etc. In the instant case the agreement which was made back at the time the Thurston quarter was acquired is the only agreement under which services were rendered. As pointed out by the appellee, the evidence does not show that the value of those services was incapable of being definitely ascertained. The decisions (and they are many) which uphold contracts of the nature last indicated, where they relate to real estate are based upon the proposition that the value of the services rendered cannot fairly be measured in money. Whenever the services are of a character that they can be measured in money and recovery had, equity will not enforce such a promise. See *Glover v. Fillmore*, 88 Kan. 545, 129 Pac. 144; *Darnell v. Haines*, 119 Kan. 633, 240 Pac. 582; *Foster v. Foster*, 129 Kan. 132, 281 Pac. 902.

The contract found by the jury was not one which clearly took the case out of the statute of frauds.

The plaintiff's theory in this case originally was that he and his father made the agreement concerning the Thurston quarter which is covered by finding No. 1, *supra,* and that thereafter, about the year 1906, the Thurston quarter was sold for $4,000 and $2,800 of this amount was used to purchase the lands in section 18. The remainder of the proceeds from the sale of the Thurston quarter was retained by the father. His theory was that at the time the Thurston land was sold, which was July 16, 1906, said land then belonged to the plaintiff and that the proceeds from its sale were used to pur-

chase the lands in section 18, under verbal contract between him and his father that the lands in section 18 should be substituted for the Thurston quarter. That inasmuch as the title was taken in his father's name and the plaintiff had in this manner furnished the purchase price, a trust resulted in favor of the plaintiff. In this connection it is interesting to note that the evidence showed the following situation:

The northeast quarter of section 18 was conveyed to the father, C. M. Roberts, January 19, 1906, about six months before the Thurston quarter was sold. The deed made by C. M. Roberts on the Thurston quarter was dated July 16, 1906. The northwest quarter of section 18 was conveyed to C. M. Roberts March 29, 1907. It is further to be noted that the record shows that when C. M. Roberts, the father, sold the Thurston quarter, he received in payment therefor only $1,000 in cash and took back a $3,000 mortgage. The quarter section of land in section 18 had been purchased by the father about six months prior to the time he sold the Thurston quarter, and it is therefore manifest that it was purchased by some means other than the proceeds from the Thurston land. The same conclusion applies to the other quarter in section 18. At the time it was purchased the $3,000 mortgage taken back on the Thurston quarter was still unpaid. The plaintiff failed entirely to establish this theory of his case, as is indicated by finding No. 4, *supra*.

Plaintiff further urges upon the court that since the jury found he had a contract (finding No. 1), and inasmuch as he had executed his part of that contract in rendering services, and further, that the right of action for the value of his services was barred by the statute of limitations, he should by reason of that situation be granted specific performance. It must not be overlooked that the agreement found in the first finding related to the Thurston quarter in section 9. We therefore have this situation:

The oral agreement executed by plaintiff upon which he demands specific performance related to lands in section 9, but he wants the agreement specifically performed by a decree awarding him the half section of land in section 18. This idea is contrary to the meaning of the term "specific performance" and is therefore not consistent. In short, a contract relating to one quarter of land, entirely separate and apart from other lands and lying some distance therefrom, cannot be specifically performed by awarding

other lands, different in description and situated far distant from the lands covered by the contract. Against the idea of specific performance as to the lands in section 18 is the finding of the jury No. 4, *supra.*

We have examined the cases decided by this court which compel specific performance where there is an oral agreement to give lands at death or by will in return for services rendered, and so far as we are able to ascertain these decisions are all founded upon the fact that services had been rendered which were of such character that the value thereof could not be readily ascertained or computed in money.

In *Bichel v. Oliver,* 77 Kan. 696, 700, 95 Pac. 396, the court said:

"If, as there held, the contract is sufficiently certain and definite in subject matter and purpose and has been clearly and certainly established by the evidence, and the facts are such as to take it out of the operation of the statute of frauds, and there are no *circumstances or conditions which would make enforcement inequitable,* courts do not hesitate to give effect to a contract, although it is not in writing. An oral agreement that operates as a transfer of land must, of course, be made out by clear and satisfactory proof, but it is not essential that it be established by direct evidence. If the facts and circumstances brought out are such as to raise a convincing implication that the contract was made and to satisfy the court of its terms, and that there would be *no inequity* in its enforcement, it is enough (italics ours)."

In the same case, at page 701, the court said:

"The services were rendered and her part of the contract performed during the lifetime of Adolph Fredericks. Her services in the family and her care and ministrations to the old people were not intended to be measured by any financial standard, and, as the court found, there is no measure by which she can be adequately compensated for the things she has done, nor would there be any estate from which she could be paid if this action should fail."

In the present case the value of the services rendered by the plaintiff could have been easily ascertained. According to the contract found by the jury, he was to have the quarter section of land known as the Thurston quarter in exchange for his services. The value of that quarter was readily ascertainable and had been for years. It was readily ascertainable at a time when plaintiff could have sued his father during his lifetime and recovered the value of the land upon which the contract was executed. That cause of action is, however, barred by the statute of limitations, and plaintiff says that because his right of action is so barred he

ought to be granted specific performance. We cannot see any logic in this argument. It is manifest that relief will not be granted in every case where a cause of action is barred by the statutes. If this were true the various statutes of limitation would become idle gestures on the part of the legislature. There would never be a time when people could feel any sense of security with reference to their property rights. The sound purpose of such statutes could always be defeated if appellant's contention were good. The trial court was evidently not satisfied that plaintiff's case was entirely "free from circumstances and conditions which rendered the claim inequitable."

Among other things bearing upon this question the record disclosed that in 1911 the father and mother of the plaintiff were divorced; that plaintiff took part in the property settlement made between the parents at that time and acted as a representative of his mother; that he witnessed the contract of settlement under the terms of which his father retained certain lands and agreed to give to the mother certain lands. The legal description of the land in section 18 was not set forth in this contract, but the court could well infer from the record that plaintiff had full knowledge of what lands were being retained by the father, inasmuch as he was familiar with his father's affairs. It further appears from the findings of the jury that on account of plaintiff's action in behalf of his mother in the divorce proceeding and consequent division of the property between his father and mother, the friendly relations between him and his father changed. This was in 1911 and the early part of 1912. In view of the changed relations between the plaintiff and his father at that time, he might well have instituted proceedings then to protect his rights. Again, in the spring of 1927, before his father's death in October following, he knew that his father did not intend to keep the alleged agreement. In either instance he could have acted before his father's death and brought about a determination of his rights while his father was still living and able to appear in court and give his testimony as to the situation between the parties.

In view of all these circumstances and the state of the record, it does not satisfactorily appear that this case is one of those which is free from "circumstances or conditions which would make enforcement inequitable."

The judgment is affirmed.